AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)       ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**02/14/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY:  _____ DVE _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**

Feb 15, 2022

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY  *Nancy Boolima*
Deputy Clerk, U.S. District Court

| | |
|---|---|
| United States of America<br><br>v.<br><br>Irvin Eduardo VELAZQUEZ ("I VELAZQUEZ"),<br>Jeff VELAZQUEZ ("J VELAZQUEZ"), and<br>Anthony Jesse REYES ("REYES"),<br><br>Defendants | Case No. 8:22-mj-00137-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 11, 2021, August 18, 2021, September 2, 2021, September 14, 2021, and

October 21, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms Without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Jason Malik, ATF TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    February 15, 2022

_____
*Judge's signature*

**DOUGLAS F. McCORMICK**

City and state:   Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA:D. Lim x3538

## **AFFIDAVIT**

I, JASON MALIK, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1.    I am a Task Force Officer ("TFO") with United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, Group II / Los Angeles Police Department ("LAPD"), Metropolitan Division Task Force.  I have been a peace officer for the LAPD for approximately 24 years.  My mission within this task force includes reducing gang-related and violent crime, assisting in the investigation, identification, location, and apprehension of persons that have committed crimes within the City of Los Angeles or against the United States, and utilizing proactive methods to monitor and prevent criminal activity.  I have been assigned to the Metropolitan Division / ATF Task Force for approximately six years.

2.    I received seven months of basic law enforcement training while attending the Los Angeles Police Academy.  I have also received several specialized training blocks in narcotics and firearms.  During my time as a peace officer, I have conducted hundreds of firearm and narcotic related investigations, including conducting surveillance at known narcotics, gang, and illegal firearm sales locations and observing the actions and methods utilized by offenders in the course of buying and selling contraband.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of a criminal complaint and arrest warrants against Irvin Eduardo VELAZQUEZ ("I VELAZQUEZ"), Jeff VELAZQUEZ ("J VELAZQUEZ"), and Anthony Jesse REYES ("REYES") each for a violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License).

4.   This affidavit is also made in support of an application for warrants to search the following for violations of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License), 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm), and 26 U.S.C. § 5861(i) (Possession of a Firearm Not Identified by a Serial Number) (collectively, the "Subject Offenses"):

      a.   The person of I VELAZQUEZ, including any digital devices on him, as described more fully in Attachment A-1;

      b.   The person of J VELAZQUEZ, including any digital devices on him, as described more fully in Attachment A-2;

      c.   The person of REYES, including any digital devices on him (collectively, with the aforementioned digital devices, the "SUBJECT DEVICES") as described more fully in Attachment A-3;

      d.   A 2016 Jeep, Utility Vehicle, bearing California license plate 8RNS126, as described more fully in Attachment A-4 (SUBJECT VEHICLE 1); and

      e.   A 4-door, 2015 Infiniti, unknown model, bearing California license plate 8TPU246, as described more fully in

Attachment A-5 (SUBJECT VEHICLE 2) (collectively, the "SUBJECT VEHICLES").

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  ITEMS TO BE SEIZED

6.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of the "Subject Offenses," as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, and A-5 and B are incorporated herein by reference.

### IV. SUMMARY OF PROBABLE CAUSE

7.    Between August 11, 2021, and October 21, 2021, an ATF Undercover Agent (the "UC"), along with an ATF Confidential Informant (the "CI"),[1] purchased firearms on five separate

---

[1]    The CI is working with the ATF in the hopes of the government making a 5K motion at sentencing in a case being prosecuted in the Central District of California.  In that case, the CI pleaded guilty pursuant to a cooperation plea agreement to one count of distribution of 50 grams or more of methamphetamine (carrying a 10-year mandatory minimum) and one count of dealing in firearms without a license (arising out of
*(footnote cont'd on next page)*

occasions, during which the SUBJECT VEHICLES were utilized either to transport the sellers or the firearms to the transaction location.  The UC and CI purchased the firearms from I VELAZQUEZ and REYES; or I VELAZQUEZ and J VELAZQUEZ; or I VELAZQUEZ, J VELAZQUEZ, and REYES.  Specifically:

      a.   On August 11, 2021, I VELAZQUEZ and REYES sold the UC and CI two handguns.

      b.   On August 18, 2021, I VELAZQUEZ, J VELAZQUEZ, and REYES sold the UC and CI a Short Barrel Rifle, a shotgun, and a revolver.

      c.   On September 2, 2021, I VELAZQUEZ, J VELAZQUEZ, and REYES sold the UC and CI one handgun.

      d.   On September 14, 2021, I VELAZQUEZ, J VELAZQUEZ, and REYES sold the UC and CI what appeared to be a self-manufactured AR-style rifle (otherwise known as a ghost gun), and six handguns.

      e.   On October 21, 2021, I VELAZQUEZ and J VELAZQUEZ sold the UC and CI one rifle and four handguns.

---

three sales of firearms to another ATF confidential informant). Notably, the CI has been prolific and dependable with his cooperation.  He has assisted with multiple undercover, controlled purchases of firearms and controlled substances.  The CI also is an illegal alien and hopes to obtain immigration-related benefits through cooperation in this case.  I reviewed the CI's RAP sheet and confirmed that, other than the aforementioned guilty plea, the CI does not have any other prior convictions.  However, the CI was arrested in August 2007 for possession of marijuana in violation of Cal. Health & Safety Code § 11357(b), and in December 2018 for grand theft auto in violation of Cal. Penal Code § 487(d)(1).  Also, CI bought marijuana from I VELAZQUEZ on approximately three occasions, starting in July 2021.  CI assumed it was permissible under both federal and state law, and told me about the purchases.  I subsequently instructed CI to stop purchasing marijuana, and CI stopped doing so.

8.    Additionally, I VELAZQUEZ recently sent texts to CI, including photographs of multiple firearms, in an effort to set up another deal in February 2022.

9.    I VELAZQUEZ, J VELAZQUEZ, and REYES do not possess a federal firearms license.

10.    Each of the purchases of firearms from I VELAZQUEZ, J VELAZQUEZ, or REYES occurred at or near the SUBJECT VEHICLES. SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 are currently registered to J VELAZQUEZ and REYES, respectively.

### V.  STATEMENT OF PROBABLE CAUSE

11.    Based on my review of law enforcement reports, conversations with other law enforcement agents and officers, conversations with other witnesses, and my own knowledge of the investigation, I know the following:

**A.    August 5, 2021: Attempted Purchase of a Firearm from I VELAZQUEZ**

12.    On or about July 6, 2021, I was contacted by the CI, who informed me that he/she met a person who was possibly selling firearms.  The CI stated that he/she had met this person at the CI's job, a mechanic shop, and that CI had previously bought marijuana from him.  The CI told me that the Suspect had three self-manufactured pistols for sale, but before agents/officers could set up the deal, the Suspect had sold the firearms.  The CI again contacted me on or about August 4, 2021 and stated that the same Suspect had a new handgun for sale for $1,350.  The deal was set to occur on August 5, 2021.

13.   The CI provided the Suspect's phone number of (310) 430-1278.  Utilizing law enforcement databases, I identified the Suspect as I VELAZQUEZ.

14.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from August 5, 2021.

a.    On or about August 5, 2021, LAPD, Metropolitan Division, Crime Impact Team Officers, and ATF Special Agents from the Los Angeles Field Office briefed on the attempted controlled purchase operation at a predetermined briefing location.  I outfitted the CI with an electronic transmitter device and a camera recording device.  The CI was searched for contraband and then given $1,350.00 in government funds to complete the transaction.

b.    The CI drove to the McDonald's, located at 5730 Firestone Bl, Southgate, CA.  Upon arrival, the CI contacted I VELAZQUEZ on his phone number.  The CI told I VELAZQUEZ to meet at a neutral location to conduct the transaction.  I VELAZQUEZ told the CI that he did not have any license plates on his vehicle and did not want to get stopped driving with a firearm in his car.  I VELAZQUEZ told the CI to drive to 8631 San Gabriel Ave, Southgate, CA 90280.

c.    The CI and I spoke about the change of location. Due to the officers and agents not previously scouting the location, I elected to abort the operation out of safety for the CI and law enforcement.  The CI contacted I VELAZQUEZ again and

told him that he/she did not feel comfortable changing
locations.  The CI told I VELAZQUEZ that they could do the
transaction on August 11, 2021, and that the CI would bring
another person with him/her on that date.

**B.    August 11, 2021: I VELAZQUEZ and REYES Sell the UC and
        CI Two Handguns**

15.    Based on my review of recorded video surveillance, my
conversations with other law enforcement agents, and my own
observations, I learned the following series of events from
August 11, 2021:

a.    On or about August 8, 2021, I spoke with the CI,
who told me that he/she had purchased marijuana from I
VELAZQUEZ.  During this interaction, I VELAZQUEZ had offered to
sell CI two firearms for $2,600.

b.    On August 11, 2021, at approximately 6:30 pm,
LAPD, Metropolitan Division, Crime Impact Team Officers, and ATF
Special Agents from the Los Angeles Field Office briefed on the
controlled purchase operation.  I outfitted the CI with a camera
recording device and the UC with an electronic transmitting
device.  The UC was given $5,000 dollars in government funds to
complete the transaction for the two firearms and to have extra
in the event I VELAZQUEZ had additional firearms for sale.  The
surveillance team then responded to the area near 8631 San
Gabriel Ave, Southgate, CA and established observation posts.

c.    At approximately 7:00 pm, the UC and CI arrived
in the area and parked north of the address given by I
VELAZQUEZ.  The CI called I VELAZQUEZ and told him that they

arrived at the location.  At approximately 7:10 pm, surveillance officers and the UC saw a 2-door, red Mercedes and black rims ("RED MERCEDES") turn onto San Gabriel Ave and park near a white Nissan SUV bearing California license plate, 8CSB263.  Officers and Agents noted that RED MERCEDES had yellow and blue, CARMAX paper plates attached to the vehicle.  Notably, prior to this date, CI had informed me that I VELAZQUEZ drove a red Mercedes sedan.  I VELAZQUEZ contacted the CI and told the CI to pull their car closer to RED MERCEDES and the Nissan SUV.  The UC repositioned their vehicle and parked closer to RED MERCEDES. The CI asked I VELAZQUEZ to verify the price of the firearms.  I VELAZQUEZ told the CI that each firearm was $1,300.  LAPD surveillance officer Mike Martinez and ATF TFO John Hackman observed I VELAZQUEZ meet with two unknown male Hispanics near the Nissan SUV.  One of the male Hispanics removed a white bag from the SUV and gave it to I VELAZQUEZ.  As described below (after the description of the September 14, 2021 deal), it was later determined that the male Hispanic who gave I VELAZQUEZ the white bag was REYES.

      d.   After repositioning the vehicle, I VELAZQUEZ approached the UC's vehicle and greeted the CI and UC.  I VELAZQUEZ gave the white bag to the CI.  The CI opened the bag and observed two Taurus gun boxes inside.  The UC then counted out the agreed upon amount of $2,600 and gave it to I VELAZQUEZ. I VELAZQUEZ told the UC and CI that he will be getting more firearms in the near future and will continue to conduct

business with them.  The three talked for a few more minutes and then said their goodbyes.

        e.      The UC and CI then returned to the staging location.  I recovered the white bag containing two Taurus handguns.  The CI was searched again for contraband.  There was no other contraband found on the CI.

### C. August 18, 2021: I VELAZQUEZ, J VELAZQUEZ, and REYES Sell the UC and CI One Short Barrel Rifle, One Shotgun, and One Handgun

16.  Following the deal on August 11, 2021, I VELAZQUEZ sent a text (photograph) of a revolver to the CI.  I instructed the CI to tell I VELZQUEZ that the CI could do another transaction the following week.

17.  On or about August 17, 2021, the CI texted I VELAZQUEZ and asked if he/she could pick up the revolver on Wednesday August 18, 2021.  I VELAZQUEZ texted the CI and asked, "Wats the deal."  The CI asked "1350 you said?" (Referring to the price of the revolver).  The two texted a few more times to confirm the location and time.  On August 18, 2021, I VELAZQUEZ texted the CI a photo of what appeared to be a short barrel rifle with the words "300 BLACKOUT" typed across the screen.  He also sent the CI a photo of what appeared to be a pump action shotgun with a

collapsible stock and plastic "side saddle."   Those photos are
published below:

 

18.   I VELAZQUEZ followed the photos with a text stating
"22 for the 300, 12 for the other one, 35 for all," and then
corrected himself in a subsequent text, "My bad he said 43."
The CI asked if this price included the revolver.   I VELAZQUEZ
responded, "Yeah all 3."   The deal was still set to occur on
August 18, 2021.

19.   Based on my review of recorded video surveillance, my
conversations with other law enforcement agents, and my own
observations, I learned the following series of events from
August 18, 2021.

a.   On or about August 18, 2021, at approximately
5:30 pm, LAPD Metropolitan Division, Crime Impact Team Officers
and ATF Special Agents from the Los Angeles Field Office briefed
on the controlled purchase operation at a predetermined briefing
location.   I outfitted the CI with a camera recording device and
the UC with an electronic transmitter device.   I searched the CI

for contraband.  The UC was given $4,700 dollars in government funds to complete the transaction for the three firearms and to have extra money in the event I VELAZQUEZ had additional firearms for sale.  The surveillance team then responded near 8631 San Gabriel Ave, Southgate, CA and established observation posts.

b.    Upon arrival to the area, surveillance officer/TFO John Hackman observed RED MERCEDES parked along the curb of San Gabriel Ave.  There appeared to be a male, Hispanic seated in the passenger seat.  TFO Hackman determined that male was not I VELAZQUEZ.  Shortly thereafter, the UC and CI arrived at the area of 8631 San Gabriel Ave, Southgate, CA.  The CI contacted I VELAZQUEZ and told him they had arrived.  I VELAZQUEZ told the CI to, once again, park their vehicle closer to his.  The CI asked I VELZQUEZ if he had the firearms.  I VELAZQUEZ told the CI that they were in the trunk.  As the UC repositioned their vehicle closer to RED MERCEDES, the UC noticed SUBJECT VEHICLE 1, and relayed to the surveillance team that it may be involved.  The UC read the license plate of SUBJECT VEHICLE 1 to be 8RNS126.  ATF TFO Tim Jang and LAPD Officer Enrique Guerrero queried the plate and noted that the registered owner was J VELAZQUEZ.

c.    After the UC parked, the CI exited the UC vehicle and greeted I VELAZQUEZ.  I VELAZQUEZ told the CI that they had the two long guns, and that the revolver would be arriving shortly.  I VELAZQUEZ directed the CI to SUBJECT VEHICLE 1.  The CI walked to the back of SUBJECT VEHICLE 1 and met with another

male Hispanic.  This male was the same male TFO Hackman observed initially seated in RED MERCEDES.  As described below (in subparagraph "j"), it was later determined that this male Hispanic was J VELAZQUEZ.  Meanwhile, I VELAZQUEZ entered the front passenger seat of the UC vehicle and met with the UC.

d.   At the back of SUBJECT VEHICLE 1, the J VELAZQUEZ displayed an AR style rifle and a shotgun to the CI.  J VELAZQUEZ told the CI that the AR style rifle was a "300 blackout, with a Colt lower, and a 7 ½ inch barrel."  He then showed the CI the 12-gauge shotgun.  J VELAZQUEZ then zipped up the rifle bag and told the CI to take the whole thing.

e.   Inside the UC vehicle, I VELAZQUEZ informed the UC that both long guns were in the trunk of SUBJECT VEHICLE 1, and the revolver would be arriving soon.  I VELAZQUEZ informed the UC the price for the two long guns was $3,000 and the price for the revolver was $1,300.  The UC counted out $3,000 for the two long guns and gave it to I VELAZQUEZ while they waited for the arrival of the revolver.  Almost immediately, the UC observed SUBJECT VEHICLE 2 arrive, at which point I VELAZQUEZ told the UC the revolver had arrived in that vehicle.

f.   TFO John Hackman and LAPD Officer Brandon Purece also observed SUBJECT VEHICLE 2 approach while driving on the wrong side of the road.  SUBJECT VEHICLE 2 parked in front of the UC vehicle.  Surveillance officers obtained the California license plate from SUBJECT VEHICLE 2: 8TPU246.  The registered owner of the Infiniti was Anthony Jesse REYES, who lived at 8631 San Gabriel Ave, Southgate, CA 90280.

g.    Additionally, LAPD's Air Support Division,
Special Flights, Tactical Flight Officer Nick Rothmitch observed
SUBJECT VEHICLE 2 arrive and park in front of the UC's vehicle.
TFO Rothmitch saw a male Hispanic exit SUBJECT VEHICLE 2 holding
a white bag.  As described below (after the description of the
September 14, 2021 deal) it was later determined that this male
Hispanic was REYES.

h.    I VELAZQUEZ exited the UC's vehicle and
approached SUBJECT VEHICLE 2.  Simultaneously, the CI carried
the black rifle bag containing the two long guns back to the UC
vehicle and handed it to the UC.  The UC placed the rifle bag
into the backseat area.  The CI then sat back down into the
front passenger seat of the UC vehicle.  After a few moments,
TFO Rothmitch broadcasted that the male from SUBJECT VEHICLE 2
(REYES) handed the white bag to the male in the grey shirt (I
VELAZQUEZ).  I VELAZQUEZ walked back to the passenger side of
the UC's vehicle and handed the white plastic bag to the CI.
The CI opened the bag and observed a Taurus gun box inside which
contained a Taurus revolver.  The UC then counted out an
additional $1,300 and gave it to I VELAZQUEZ.  The CI asked I
VELAZQUEZ about additional firearms.  I VELAZQUEZ told the UC
and CI that he will be getting new firearms in the next week.
The three then said their goodbyes and the UC drove back to a
predetermined staging location with the CI.

i.    At the staging location, I recovered the rifle
bag and white bag containing the firearms.  Inside the rifle bag
was a Short Barrel Rifle and a Shotgun, and inside the white

plastic bag was a revolver.  The CI was searched again for contraband.  There was no other contraband found on the CI.

j.  Utilizing law enforcement databases, I identified the male from the Jeep (who gave the rifle bag containing the short barrel rifle and shotgun to CI) as J VELAZQUEZ.  I showed a DMV photograph of J VELAZQUEZ to UC and CI, and both positively identified him as the person who provided the short barrel rifle and shotgun.

**D.  September 2, 2021: I VELAZQUEZ, J VELAZQUEZ, and REYES Sell the UC and CI One Handgun**

20.  Between August 24, 2021, and August 28, 2021, the CI and I VELAZQUEZ exchanged a series of text messages.  The text messages showed several firearms and texts between the two in which I VELAZQUEZ offered to sell the firearms to the CI.  The CI contacted me about the text messages.  According to the CI, I VELAZQUEZ had sold the majority of the firearms and had to contact his cousin to find out what other firearms were available.  On or about August 31, the CI contacted me and stated that I VELAZQUEZ had one firearm for sale for $1,200.  I instructed the CI to set the deal up to occur on September 2, 2021.

21.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from September 2, 2021:

a.  On or about September 2, 2021, at approximately 5:30 pm, LAPD Metropolitan Division, Crime Impact Team Officers

and ATF Special Agents from the Los Angeles Field Office briefed on the controlled purchase operation at a predetermined briefing location.  I outfitted the CI with a camera recording device and the UC with an electronic transmitter device.  I searched the CI for contraband.  The UC was given $1,200 dollars in government funds to complete the transaction for the firearm.  The surveillance team then responded near 8631 San Gabriel Ave, Southgate, CA and established observation posts.

b.  Upon arrival to the area, surveillance officer/TFO John Hackman, observed males loitering in the area. After a few minutes, TFO Hackman observed RED MERCEDES driving on San Gabriel Ave and parking along the curb.  TFO Hackman observed I VELAZQUEZ exit RED MERCEDES.  The UC and CI departed the staging location and drove to the area near 8631 San Gabriel Ave, Southgate, CA.  The UC parked the UC vehicle near RED MERCEDES.  The CI exited the UC vehicle and met with I VELAZQUEZ.  The two greeted each other and I VELAZQUEZ told the CI that the firearm was being oiled and motioned towards SUBJECT VEHICLE 1.  The CI walked over to SUBJECT VEHICLE 1, and I VELAZQUEZ entered into the front passenger seat of the UC vehicle.

c.  At the back of SUBJECT VEHICLE 1, the CI met with J VELAZQUEZ and, an individual later determined (as described below after the description of the September 14, 2021 deal) to be REYES.  The CI observed a firearm, broken down into several components, and J VELAZQUEZ cleaning it.  The CI asked J VELAZQUEZ how he learned to do that.  J VELAZQUEZ told the CI

that he learned from having his own firearms and from "Youtube."
J VELAZQUEZ then put the firearm back together and racked the
slide several times.  J VELAZQUEZ pulled the trigger of the
firearm, racked the slide again, and pulled the trigger once
again.  J VELAZQUEZ did this approximately three times.  J
VELAZQUEZ then placed the firearm into a firearm box and then
into a white plastic bag.  The CI asked J VELAZQUEZ his name.  J
VELAZQUEZ responded with "J."  The CI then asked both J
VELAZQUEZ and REYES where they lived.  REYES told the CI that he
lived right here and motioned towards 8631 San Gabriel Ave,
Southgate, CA.  J VELAZQUEZ told the CI that he used to live
here, but had moved to a different location.

        d.   Meanwhile, I VELAZQUEZ sat in the UC vehicle and
discussed firearms and prices with the UC.  I VELAZQUEZ told the
UC that he will be getting a new shipment next week, possibly on
Wednesday (September 8, 2021).  After a few minutes, I VELAZQUEZ
exited the UC vehicle and obtained the plastic bag from J
VELAZQUEZ and returned to the UC vehicle.  I VELAZQUEZ gave the
plastic bag with the firearm to the UC.  In exchange, the UC
gave I VELAZQUEZ the agreed upon amount of $1,200.  I VELAZQUEZ
exited the UC vehicle and the CI reentered the UC vehicle.  The
three said their goodbyes and the UC drove away to a
predetermined location.

        e.   At the staging location, I recovered the white
bag containing the firearm.  Inside the white plastic bag was a
handgun.  The CI was searched again for contraband.  There was
no other contraband found on the CI.

**E.    September 14, 2021: I VELAZQUEZ, J VELAZQUEZ, and REYES Sell the UC and CI One AR Style Rifle and Six Handguns**

22.    Between September 9, 2021, and September 14, 2021, the CI and I VELAZQUEZ exchanged a series of text messages.  The text messages showed several firearms and texts between the two in which I VELAZQUEZ offered to sell the firearms to the CI. The CI contacted me about the text messages.  According to the CI, I VELAZQUEZ had three firearms to sell the CI.  I instructed the CI to set the deal up to occur on September 14, 2021.  On September 14, 2021, prior to the deal, I VELAZQUEZ contacted the CI again and stated that he had additional firearms for sale which included one AR rifle, one Ruger, four Glocks, and one Sig Sauer with two frames, for $10,400.  I told the CI to let I VELAZQUEZ know we would buy all the firearms.

23.    Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from September 14, 2021:

a.    On or about September 14, 2021, at approximately 5:30 pm, LAPD Metropolitan Division, Crime Impact Team Officers and ATF Special Agents from the Los Angeles Field Office briefed on the controlled purchase operation at a predetermined briefing location.  TFO Malik outfitted the CI with a camera recording device and the UC with an electronic transmitter device.  I searched the CI for contraband.  The UC was given $10,400 dollars in government funds to complete the transaction for the

17

firearms.  The surveillance team then responded near 8631 San Gabriel Ave, Southgate, CA and established observation posts.

b.   Upon arrival to the area, surveillance officer/LAPD Officer John Bain, saw RED MERCEDES and SUBJECT VEHICLE 1 parked on San Gabriel Ave along the curb. Additionally, at approximately 6:30 pm, LAPD Air Support, Special Flights, Tactical Flight Officer Dan Putnam was also monitoring the deal location and observed RED MERCEDES and SUBJECT VEHICLE 1 parked along the curb.  TFO Putnam then observed a black sedan driving on the street and park near the Mercedes and Jeep.  A male Hispanic exited the sedan and retrieved a black bag from within the sedan.  As described below (in subparagraph "f" below), it was later determined by surveillance officers that this sedan was SUBJECT VEHICLE 2, and thus it appears as though the male Hispanic referenced here was REYES (based also on confirmation noted in subparagraph "h" below).  The male then took the bag to the rear of the Jeep where the other Suspects were loitering.

c.   The UC drove the UC vehicle to the area with the CI.  The UC parked the UC vehicle near RED MERCEDES.  The CI exited the UC vehicle and approached the back of SUBJECT VEHICLE 1.  At the back of SUBJECT VEHICLE 1, the CI met with I VELAZQUEZ, J VELAZQUEZ, and REYES.  The four briefly spoke before the CI told I VELAZQUEZ to go count the money.  I VELAZQUEZ walked to the UC vehicle and entered into the front passenger seat.

      d.   Inside the rear compartment of SUBJECT VEHICLE 1, the CI saw several firearms inside gun boxes.  J VELAZQUEZ removed some of the handguns from the boxes and showed them to the CI.  J VELAZQUEZ also gave the CI a description of some of the firearms.  J VELZQUEZ then displayed an AR style rifle to the CI.  The three of them talked while they waited on the UC and I VELAZQUEZ to finish counting the money.

      e.   Inside the UC vehicle, I VELAZQUEZ engaged the UC in conversation regarding the price of the firearms, future firearm purchases, and possible purchase of cocaine.  I VELAZQUEZ displayed a small amount of cocaine to the UC while inside the UC vehicle.  Once the UC received a non-verbal, thumbs-up from the CI that all the firearms were accounted for, the UC began to count out the money for I VELAZQUEZ.  The UC gave I VELAZQUEZ the agreed upon amount of $10,400.  I VELAZQUEZ exited the UC vehicle and told the CI that everything was good.  The CI then collected the firearms from the back of SUBJECT VEHICLE 1, and placed them into the UC vehicle.  The UC, CI, and I VELAZQUEZ said their goodbyes and the UC drove away to a predetermined staging location.

      f.   After the UC was out of the area, ATF TFO Tim Jang drove on San Gabriel Ave and obtained the license plate to the black sedan observed by Tactical Flight Officer Dan Putnam.  The vehicle was the same black Infiniti (SUBJECT VEHICLE 2) seen on prior deals.  TFO Jang obtained the license plate of 8TPU246.  The vehicle was registered to Anthony Jesse REYES.

g.    At the staging location, I recovered the bags containing the firearms.  Inside the bags were six handguns along with another frame.  Additionally, I recovered an AR style, self-manufactured rifle, bearing no serial number (a ghost gun).  A photograph of the firearms seized is below.  The CI was searched again for contraband.  There was no other contraband found on the CI.



h.    Post-operation, I queried REYES (registered owner of SUBJECT VEHICLE 2), and obtained a photograph of REYES.  I noticed that REYES was the same person who provided the firearm to I VELAZQUEZ on August 11, 2021.  I also saw that REYES was the same person captured on CI's video transmitter (other than I VELAZQUEZ AND J VELAZQUEZ) during the chat behind SUBECT VEHICLE 2 during this September 14, 2021 deal.  Further, UC confirmed that REYES was the person who delivered the firearm (in a white bag) to the deal on August 18, 2021 in SUBJECT VEHICLE 2, and who was present on September 2, 2021.  Additionally, CI

confirmed that REYES was at all of the deals thus far, and specified that REYES was the one who provided the firearms (in the white bag) to I VELAZQUEZ on August 11, 2021.

**F.   October 21, 2021: I VELAZQUEZ and J VELAZQUEZ Sell the UC and CI One Rifle and Four Handguns**

24.   Between October 17, 2021, and October 21, 2021, the CI and I VELAZQUEZ exchanged a series of text messages.  The text messages showed several firearms and texts between the two in which I VELAZQUEZ offered to sell the firearms to the CI.  The CI contacted me about the text messages.  The CI initially told me that I VELAZQUEZ wanted to sell the CI five firearms for $12,900.  I told the CI that was too much money and to tell I VELAZQUEZ to lower the price.  The CI and I VELAZQUEZ haggled over the price of the firearms and the two agreed to conduct the sale of eight firearms for $11,900.

25.   Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from October 21, 2021:

a.   On or about October 21, 2021, at approximately 6:30 pm, LAPD Metropolitan Division, Crime Impact Team Officers and ATF Special Agents from the Los Angeles Field Office briefed on the controlled purchase operation at a predetermined briefing location.  I outfitted the CI with a camera recording device and the UC with an electronic transmitter device.  I searched the CI for contraband.  The UC was given $11,900 dollars in government funds to complete the transaction for the firearms.  The

surveillance team then responded near 8631 San Gabriel Ave, Southgate, CA and established observation posts.

b.    The UC and CI departed the staging location and drove to the area near 8631 San Gabriel Ave, Southgate, CA.   The UC saw RED MERCEDES parked along the curb.   The UC parked the UC vehicle near RED MERCEDES.   The CI exited the UC vehicle and greeted I VELAZQUEZ.   I VELAZQUEZ entered the UC vehicle and sat in the front passenger seat.   The CI walked over to SUBJECT VEHICLE 1 and met with J VELAZQUEZ.

c.    While at the back of SUBJECT VEHICLE 1, the CI saw numerous firearms in gun boxes.   J VELAZQUEZ removed some of the handguns from the boxes and showed them to the CI while providing a description of some of them.   J VELZQUEZ then displayed a rifle and told the CI it was a Kel Tec, Sub 2000 rifle which folded in half.

d.    Meanwhile, I VELAZQUEZ sat in the UC vehicle and discussed firearms and prices with the UC.   Additionally, I VELAZQUEZ told the UC that he did not have all the firearms and only had five of them.   I VELAZQUEZ told the UC that he had already sold some of the firearms.   I VELAZQUEZ showed the UC photos of other firearms on his cell phone.   I VELAZQUEZ and the UC agreed on the price for the five firearms: $7,800.   The CI walked back to the UC vehicle and asked I VELAZQUEZ if the guy in the white car (parked nearby) was his "homie."   I VELAZQUEZ told the CI that person was his uncle and he is the one that gave him the "folded one" (referring to the Kel Tec rifle).   The

UC then counted out $7,800 for I VELAZQUEZ and gave it to him. I VELAZQUEZ exited the UC vehicle.

        e.   After checking with I VELAZQUEZ and the UC that everything was good, the CI retrieved the firearms from the back of SUBJECT VEHICLE 1 and carried them back to the UC vehicle. The CI placed the firearms inside the UC vehicle and sat in the front passenger seat.  The three of them said their goodbyes and the UC drove away to a predetermined staging location.

        f.   Once at the staging location, I recovered the bags containing the four handguns and one rifle.  Additionally, I discovered a torn piece of paper inside one of the bags with the name "Jeff" on it and a phone number.  Utilizing law enforcement databases, TFO Malik determined that number was associated with J VELAZQUEZ.  The CI was searched again for contraband.  There was no other contraband found on the CI.

### G.    I VELAZQUEZ Sends the CI Text Messages and Additional Photographs of Firearms For Sale

    26.  Between January 25, 2022, and February 3, 2022, I VELAZQUEZ sent the CI text messages and photographs of additional firearms for sale (see below).  The CI told I VELAZQUEZ that the UC was not currently available and that the deal could be conducted at a later date and time.  I reviewed the text messages and photographs and the firearms appear to be several Glock style handguns, a shotgun, an AR-style, Short Barrel Rifle, and a possible Machine Pistol.  Additionally, I VELAZQUEZ told the CI that the price of all the firearms was $14,600.

   

   

27. On or about February 13, 2022, I VELAZQUEZ sent CI additional photographs of what appear to be an AR-style, short-barrel rifle, a TEC-9 pistol, and several handguns. I VELAZQUEZ also indicated to CI via text that he had "[a]nother fully auto tech," which I believe refers to a TEC-9 pistol. Photos of the messages and photos are below:

   

  

**H.   Recent Surveillance of SUBJECT VEHICLES**

28.   On February 11, 2022, LAPD Officer Armando Hoyos observed SUBJECT VEHICLE 1 parked to the rear of 6217 Carmelita Ave, Bell, California, the registered address of J VELAZQUEZ. The vehicle was parked inside the gate of the residence.  Later that same evening, LAPD Officer Armando Hoyos observed SUBJECT VEHICLE 2 parked in the driveway of 8631 San Gabriel Ave, South Gate, California, the registered address for A REYES.

**I.   I VELAZQUEZ, J VELAZQUEZ, and REYES Do Not Have a Federal Firearms License**

29.   On or about September 28, 2021, Supervisor Kimberly Rowland of the ATF Federal Firearms Licensing Center conducted a

query in ATF's Firearms Licensing System ("FLS"), which contains information on all federal firearm licenses issued by the federal government.  The examiner determined that I VELAZQUEZ, J VELAZQUEZ, and REYES do not have a federal firearms license.  In addition to this query, ATF Industry Operations Investigator ("IOI") James Palm conducted a subsequent search on January 27, 2022, which query did not yield any current, former, or pending applications or licenses for I VELAZQUEZ, J VELAZQUEZ, or REYES.

### J.   I VELAZQUEZ, J VELAZQUEZ, and REYES Do Not Have Any Firearms Registered to Them in the National Firearms Registry

30.   On or about September 24, 2021, ATF Firearm and Explosives Specialist Robert Howard queried the National Firearms Registration and Transfer System ("NFRTS").  The NFRTS contains information on all firearms covered by the National Firearms Act ("NFA"), which includes short-barreled rifles.  The query revealed that I VELAZQUEZ and J VELAZQUEZ do not have any NFA firearms registered to them.  Then, on or about January 27, 2022, IOI James Palm queried again, this time including REYES in the query, and determined that none of the three individuals had any NFA firearms registered to them.

### VI.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

31.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as

items of value and usually keep them in their residence or
business, or in places that are readily accessible, and under
their physical control, such as in their digital devices.  It
has been my experience that individuals who own or sell firearms
illegally will keep the contact information of individuals who
are supplying firearms or other individuals involved in criminal
activities for future purchases or referrals.  Such information
is also kept on digital devices on their person and in backpacks
or purses in their vicinity.

   b. Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular

phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. TRAINING AND EXPERIENCE IN DIGITAL DEVICES

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress I VELAZQUEZ's, J VELAZQUEZ's or REYES's thumb- and/or fingers on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICES in front of I VELAZQUEZ's, J VELAZQUEZ's or REYES's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII.     CONCLUSION

34.  For all of the reasons described above, there is probable cause to believe that Irvin Eduardo VELAZQUEZ, Jeff VELAZQUEZ, and Anthony Jesse REYES have each committed a

violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms
Without a License).  There is also probable cause that the items
to be seized described in Attachment B will be found in a search
of the persons described in Attachment A-1, A-2, A-3, and the
SUBJECT VEHICLES described in Attachments A-4 and A-5.

35.   Further, there is probable cause to believe that the
items listed in Attachment B, which constitute evidence, fruits,
and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A)
(Dealing in Firearms Without a License), 26 U.S.C. § 5861(d)
(Possession of an Unregistered Firearm), and 26 U.S.C. § 5861(i)
(Possession of a Firearm Not Identified by a Serial Number) will
be found on the persons, SUBJECT DEVICES and in the SUBJECT
VEHICLES, as described in Attachment A-1 through A-5.


/s/
_____
JASON MALIK
Task Force Officer,
Bureau of Alcohol, Tobacco,
Firearms and Explosives


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 15th day of
 February , 2022.

**DOUGLAS F. McCORMICK**
_____
UNITED STATES MAGISTRATE JUDGE